First for Mr. Farrar May it please the court, Eric Farrar for Appellant Brian Russ, Jr. In this case, the appellee Mr. Johnson has asserted that his First Amendment right to petition the government for redress of grievances has been interfered with. But the evidence is that on March 21, 2016, Mr. Johnson submitted a petition to the City of Hearne, Texas. The city scheduled a city council meeting and the city council met on March 28, 2016. They discussed that petition, debated it, and ultimately voted on how to handle it. So Mr. Johnson did petition his government for the redress of grievances. I think that portion of the case really is that simple and straightforward. It's when we get into some of the other arguments and issues that have been raised that to me it's kind of confusing. I get a little twisted up. So to analyze that, we have to start with the scope and standard of review. This case is before this court on an interlocutory appeal. The district court denied Mr. Russ's motion for summary judgment on qualified immunity grounds. So once he raised that on summary judgment, it became Mr. Johnson's burden to provide evidence, not allegations, of a constitutional violation and that the particular conduct engaged in by Mr. Russ was clearly established beyond debate by pointing to a case with analogous or near-analogous facts. And I submit that Mr. Johnson did not meet the burden on either of those. First, what is the constitutional violation at issue? As I just said, Mr. Johnson did in fact petition the city council for redress of grievances. So the allegation and then the conduct in the district court's order is that Mr. Russ somehow interfered with this initiative measure getting put on an election ballot. Certainly, the text of the First Amendment does not include that right. No authority is cited that shows that that's a right under the petition clause of the First Amendment. And so with no authority, it's hard to say that that's a clearly established right either. In the response to Mr. Russ's 12B6 motion, which Mr. Johnson incorporated into his response to summary judgment, he points to the U.S. Supreme Court cases of Meyer v. Grant and John Doe No. 1 v. Reed that have to do with initiative petitions and acknowledges by citing those cases that the right to the initiative comes from state law. But once it's created by state law, that the First Amendment is going to provide some floor of protection to the activities associated with that initiative petition. But in this case, because the state can define and limit the right of the initiative, neither Mr. Johnson nor the district court addressed the state law at all and how anything Mr. Johnson did interfered with getting that initiative on the ballot, assuming there's a constitutional right to get it on a particular ballot. Under Texas law, to get that initiative on the city's election ballot, the only entity that can do that is the city council. And as I just said, it's undisputed that the city council had that petition within a week of Mr. Johnson filing it. And then under Texas law, the next election that it could possibly be on would be the November 2016 ballot. And the last date for city council to call an election to get it on that ballot was August 22, 2018. And so, without getting into the particulars right at this moment, all the actions supposedly performed by Mr. Russ occurred at the latest, the very beginning of May of 2016, which I believe I've got a number in my briefs, I didn't recalculate it, but it's about 109 days before the city council had to call that, had a deadline before they could get it on the November ballot. So there's absolutely nothing that occurred in those 109 days, certainly nothing Mr. Russ did, that interfered with getting that election on the ballot, excuse me, that initiative on the election ballot. And I think, as I understand the arguments, as I understand the theory, there's a conflation, a confusion, kind of a false equivalency between the county elections administrator and the city council. But the county elections administrator cannot put anything on the ballot, only the city council can. So accepting as true that Mr. Russ submitted a portion of the signatures to the city council, or excuse me, to the county elections administrator, or only submitted a portion of the signatures initially and then submitted the rest a few days, or 20 days later. Again, that's immaterial. It's not a material fact to prevent qualified immunity because the county elections administrator has no role in getting that on the election ballot. At most, the county elections administrator would check these signatures to see that they belong to registered voters of the city of Hurley. Counsel, let me make sure I understand your argument, whether you're focusing more on the time, that it was too late by the time the petition was submitted to get it on any ballot before November, and all this was taken care of long before November. To what extent is your argument focused on that, and to what extent is it that before, in addition, before that date occurred, your client had, in fact, turned over all the pages of signatures so that it was understood, sufficient signatures. If he had never, if he had hidden the other signatures, denied he ever had them, separated them from the petition, whatever, and the court was never aware of them, and the date comes in November, would that have been a First Amendment violation under Meyer? Is that interfering with the right to circulate petitions? Your Honor, the way I understand Meyer and the description in Meyer of why the Supreme Court concluded that the circulation of a petition is core political speech is because it involves the interaction of citizens. The petition circulator is going to people and trying to convince them, if not to agree with the initiative itself, to agree that it's important enough that it ought to be put to the vote. That's core political speech. Here, the speech was concluded. It was already submitted to the city council. So I guess what I'm asking is if there's a — I mean, the right to have an initiative is something that has to be created by whatever the jurisdiction says, but the right of circulating petitions exists as a First Amendment right. If your client had interfered with the efficacy of at least the part of the process covered by Meyer, which is getting petition signatures, signatures on the petition, is that potentially a First Amendment violation? He corrected it. And so I'm wondering, is it the fact that he corrected it in time, is that why Meyer is irrelevant? Or is it just because he — what he did was after the petitions had been circulated? My understanding, the way I've been approaching this, Your Honor, is it's because his actions took place after circulation was complete. Once the — Mr. Johnson and the other petition circulators submitted those petitions to the city, they were no longer circulating them among the populace. They were done. It was now part of the city charter and the Texas election code on what was to occur with those. Assuming that Meyer would extend that far, number one, again, I would say that it's not clearly established that it does, because that's not the particular facts of Meyer. But even assuming it does, on summary judgment for a qualified immunity defense, this Court's recent case of Mitchell v. Mills says that it's the plaintiff's burden to come up with specific evidence of each element of the claim. And here, there has to be conduct that caused the violation. And even if Mr. Or the delay from March 28th at city council meeting to April 6th, or the delay from April 6th to April 27th in producing all of the signatures, it's undisputed that as of April 27th, the county elections administrator had all the signatures. And again, that's months and months before the deadline for the city council to act. And — What's the timing of the litigation? To what extent did the litigation perhaps force the hand of your client, I guess is what I'm looking for. You have the declaratory judgment filed by the city. When is the counterclaim filed in relation to when these signatures are turned over to city council or wherever gets them? In relation to those events, the declaratory judgment action and the countersuit, counterclaims by the plaintiff? Yes, Your Honor. According to my timeline, March 21st, Mr. Johnson submits the petition. March 28th, city council meets. And the resolution that came out of that meeting was directing the city attorney, Mr. Russ, to file suit challenging that petition. He filed that lawsuit approximately eight days later on April 6th. Mr. Johnson's counterclaim was filed April 21st. And so it was filed in between, I believe the evidence is that it's on the record, page 823, that April 7th is when Mr. Russ delivered the first, not literally one-third numerically, but one of three packets to the county elections administrator. And then, so approximately two weeks later, Mr. Johnson on April 21st filed his counterclaim. And approximately six days later, on April 27th, that's when Mr. Russ delivered the remaining signatures, the other two packets of signatures to the county elections administrator. Does that have relevance into your argument? I know you're focusing primarily on qualified immunity, as well you should, since that's what you're here on. But it does seem to me that even if the right is limited to the circulation of the petitions, it seems to me that right may well include some effect of circulating petition under whatever the local authority is for doing that, State or local law. And if your client interfered with that, and his hand was forced by litigation, it seems to me that there may be a claim there. Potentially, Your Honor. But qualified immunity, of course, is an objective test, not a subjective one. So even if Mr. Russ, on April 6th, intentionally, with ill will, withheld some signatures, but then when the countersuit got filed, thought better of it, changed his mind, got scared and filed the rest, that's his subjective intent. And I still think, because of the timing issue, there's a very big problem that if the right that is being asserted is the right to get it on that November or perhaps a subsequent ballot, any interference done on April 27th didn't interfere with that right. It just, it's, I forget the case, I think it may be the Melton case out of this circuit, that talks about even when there's some conduct that potentially violated a right, if it's too attenuated from the actual harm, then there's no violation. The qualified immunity still attaches. And so, assuming Mr. Russ, which obviously we dispute, but assuming Mr. Russ was doing something wrong intentionally, he did correct before, well before it could have impacted Mr. Johnson's right. And as my time is starting to tick down, I think we have to at least, even though I didn't brief it extensively, I think we have to at least touch on rightness and mootness, since they're jurisdictional concerns. When Mr. Johnson filed this suit on April 21st saying, you've interfered with my right to get this initiative on the ballot, it wasn't right at that time. City Council still had months and months to act, and the outcome of the pending state court lawsuit could well have decided that issue. If the court decided the city was right, it couldn't be on the ballot as a matter of law. If the court decided the city was wrong, well, then the city council had a ministerial duty to put it on that ballot. So to say that something Mr. Russ did interfered with that right at that time, it was speculation. It was uncertain to occur, which is the definition of rightness. And, of course, that's borne out by what occurred subsequently. In the May 2016 election, the composition of city council changed, and then they voted to conduct an audit, which was the very measure that Mr. Johnson was trying to get passed by the initiative petition. So that already really mooted it, because what he asked for, the relief he asked for, occurred. And then before the last day for the city council to order the November election, Mr. Johnson settled all his claims and potential claims against the city. And under Texas law, because it's a ministerial duty, if there's a ballot petition to put it on the ballot, Mr. Johnson said one of his claims was a mandamus, a petition for writ of mandamus, to order the city council to place it on the election ballot. He settled that claim before the deadline. So that harm that he's complaining about could never have occurred, because he settled that claim. As my time's winding down on the opening here, are there any further questions, or I'll stick to, again, on rebuttal? Did the initiative end up not going on the ballot because the audit had already been done? I'm not sure the exact reason why, Your Honor. But, yeah, it did not get on the ballot. And I assume that's the reason why, because it was being conducted. Thank you. Thank you. Good morning. May it please the Court. My name is Ty Clevenger. I'm here on behalf of the plaintiff, Milton Johnson. And I was told as a young lawyer that when you're up on appeal, it's dangerous to spend all your time arguing the facts. And what we've had this morning is long and extensive arguments about the facts. And the defendant is asking the Court to construe all the facts in the favor of the defendant. That's problematic in any appeal, but it is all the more problematic in this appeal, because in 2004, this Court decided en banc in Kenney v. Weaver that when you are appealing in a qualified immunity case, the factual findings of the trial court are taken as stated. And as you've seen from the briefing, we've gone back and forth, and just as a courtesy and for completeness of the record, I've shown that all these supposedly undisputed facts are, in fact, very much disputed. But the bottom line remains, the Court found the facts, and that is what the trial court did, and that is what is before this Court. Those findings were that the petition was circulated, it was filed with the city, and that Mr. Russ, if you want to call it intercepted, withheld, however you want to phrase it, intercepted some of those petition signatures, and he held those signatures from the city clerk, and he started producing them piecemeal. First, when I was hired by my client and asked what was going on, he turned in some of the signatures. I threatened to sue, and he kept dragging his feet. And then finally, when we filed suit, he turned in the remaining signatures. There is an, essentially seems to be an argument, and the facts and the arguments seem to keep shifting from moment to moment, that there was no harm done here. What relief are you seeking? We are seeking that you affirm the trial court. We think this needs to go to trial. What, are you seeking damages? We are seeking damages, I'm sorry. And those are what? They are going to be for his First Amendment violations, for the fact, attorney's fees. He had to hire an attorney to force this to happen. And the idea that, oh, there's no harm here, it costs people money to hire attorneys to vindicate their constitutional rights. And so harm was done here. The court is probably familiar with L. Rodney Burns, the 1976 Supreme Court case, which says the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury. And so while this city attorney is withholding letters from the city council, withholding petition signatures from the person who verifies them, that's an injury to my client that is real. And it may be... I guess the firmly or well-established law that you're saying has been violated here. Thank you, Your Honor. If I may, I'm going to start by reading a case decided in the Supreme Court cases. It is Utah Republican Party v. Cox, that's 892 F3D 1066. And I quote, it is beyond cabal that voting is one of the most fundamental... is of the most fundamental significance under a constitutional structure. It cites Burdick v. Tekushi, that is a 1992 Supreme Court case, and in turn quotes Illinois Board of Elections v. Socialist Workers' Parties, that is a 1979 case, access to the ballot and the ballot box is the necessary catalyst in the carefully calibrated system of individual freedoms and separation of powers crafted by our founding fathers. Accordingly, we take great care to scrutinize any electoral regulation that would appear to restrict this access. And what I would like to focus on is this phrase, access to the ballot. And the Tenth Court makes that distinction, the phrase access to the ballot and to the ballot box. And so looking at the constitutional history or the Supreme Court's history on this, I would agree Meyer is not the best case in terms of being on point. But if you go back to the earlier cases, for example, in 1968 I believe it was, Williams v. Rhodes was one of the early Supreme Court cases where the Supreme Court held that there is a First and Fourteenth Amendment for third parties to get on the ballot. So that's where that term access to the ballot comes in. So it's not just merely a matter as in Meyer of your circulating petitions. It is a broader issue, access to the ballot. If you're a third party, you're trying to get your candidates on the ballot. And I mentioned earlier Monroe v. Socialist Workers' Party, that was Supreme Court 1986, similar sort of principle. There was a case from this court in 1988, that's Pilcher v. Rains, 853 F.T. 2D 334. The Libertarian Party was trying to get on the ballot. I believe that was in Texas. And this court said the First and Fourteenth Amendments forbid a state from using its regulatory power to unnecessarily burden access to the ballot. Now, in those cases, you're looking at a balancing test to determine if the regulations are reasonable burdens on a party or group's access to the ballot. I would defy the defendant to come up to any reason, with any reasonable explanation for withholding these signatures. If I could use an analogy. JUSTICE SCALIA. Let's make sure. I mean, you moved on from Russ, I mean from Myers. You're still on Russ, but on Myers' case. Are you saying that the constitutional obligation under Myers had been satisfied, and so you do need different, clearly established law to create the right to proceed here? MR. BOUTROUS. Actually, I'm not, Your Honor. I would say even under Myers, it's quite clear. And it's the defendant is trying to be hyper-technical and slight. JUSTICE SCALIA. It's not hyper-technical. I mean, Myers is talking about not being allowed to use paid circulators of ballots. And if you have the initiative process, or whatever the process was there, you can't limit it that way. But there was no interference with that in this case. So I'm not disagreeing with your bridging yourself into some other case law, reading it off your laptop there. So just tell me how you see Russ, I mean Myers, still fitting in here. MR. BOUTROUS. Well, I believe you alluded to it earlier, Your Honor, that the idea of petitioning, I would say, goes farther than just circulating. JUSTICE SCALIA. What is the state? Who created this petition right or process that was being used? The county? The state? Is this a state process? MR. BOUTROUS. City Charter. City Charter. JUSTICE SCALIA. Okay. City Charter. So it is, they could have eliminated this altogether. There's no obligation to have this kind of process. So does the Constitution involve merely because the city charter allows it? Does that then take you to the cases that you want us to deal with, which are really dealing with states, primarily, I guess, local governments too, having elections and you're trying to see who the candidates are going to be? Is that what we're talking about here? Is that, at least in the analogy it seems to me, not a direct application? MR. BOUTROUS. Well, even in Meyer, the principle is made that once the state creates this right of initiative and referendum, then First and Fourteenth Amendments attach. And so that's the principle I'm arguing here is that under Meyer, clearly, the city charter had created this right and now the First and Fourteenth Amendment rights attach to the exercise of that right. And there's the broader principle in many of these cases that I've cited, that the states can regulate their elections. Nobody disputes that. But once they set those regulations, First and Fourteenth Amendment rights attach to getting on the ballot, to having access on the ballot. And that's, and if I may use an analogy, Your Honor, it's, I believe, simple but fair. Every competent adult knows that you can't rob a bank. I think we all understand that. But Mr. Russ is essentially arguing, well, I didn't do it the typical way. I didn't walk through the front door with a gun and a mask. I abducted an employee and forced my way in through the back door, and so, therefore, it's not really bank robbery. Any competent city attorney should know that you can't, I mean, it's tampering with the government record, for one thing. MS. MCDOWELL. Well, I'm trying to see how that interfered with the First Amendment rights, because, and if I'm wrong, please straighten me out. I thought, while the city attorney was withholding signatures, the petition still got to the city council, and they had no reason to think there were an inadequate number of signatures. And they directed that a lawsuit be filed that had nothing to do with the lack of signatures. MR. RUSS. That's where the factual dispute comes in. That is their version of the facts. And they claimed that what you just described was undisputed. And that's why I filed a counter-reply, pointing to the evidence where it absolutely is disputed. They're claiming that, or Mr. Russ is claiming, well, you know, we weren't going to challenge it on the basis of the sufficiency of the signatures. I have an affidavit from the city council. MS. MCDOWELL. Okay. What did the city council do? Did they, is it disputed or not, that they directed on March the 28th for a suit to be filed to challenge the petition on grounds unrelated to signatures? MR. RUSS. They did authorize that. That is clear. They did authorize that. MS. MCDOWELL. So at that point, there wasn't even an issue about lack of signatures. The city council said, we ain't putting it on the ballot. MR. RUSS. That is correct. But they had not completely resolved the issue of the signatures. MS. MCDOWELL. Right. Then you did have to file a suit to get the signatures, but that didn't really affect what the city council was doing, it doesn't seem to me. They had already filed the lawsuit saying we're not going to put it on the ballot. And then the signatures, it seems like to me the lack of signatures was never an impediment. It never came into play one way or the other as to whether this petition was going to be placed on the ballot. MR. RUSS. I would disagree with that, Your Honor. MS. MCDOWELL. Okay. That's what I'm trying to understand. MR. RUSS. Sure. Certainly, that is the spin that Mr. Russ has put on these facts. From my client's perspective, we didn't know that. All we know, and we've got a city council member saying that was not the facts, that yes, it may be true that they had not decided actually, they had not decided whether to put it on the ballot. It was too late for the May ballot. He's correct about that. So the issue was the November ballot. MS. MCDOWELL. Right. MR. RUSS. And so they had decided to file a suit before they decided whether to put it on the ballot. MS. MCDOWELL. Right. MR. RUSS. So they had not voted one way or another. MS. MCDOWELL. Right. But at that point, the lack of signatures had nothing to do with the city council saying yes or no. MR. RUSS. Right. But we're arguing on a parallel track. At the same time, he's trying to make it appear like there aren't enough. MS. MCDOWELL. Right. But then it becomes clear within a matter of days that there are a number of signatures. MR. RUSS. But only because we had to file a suit before they did. MS. MCDOWELL. Right. Right. But you still got your petition in front of the city council, and the city council still acted on or prepared to act on the merits of it one way or the other. So the missing link to me that I don't see is how your client's First Amendment rights were affected. MR. RUSS. Well... MS. MCDOWELL. Because the city council saw the petition. They never questioned the lack of signatures. It was always, the petition was always addressed by the city council on its merits. And that's why I'm having, how did the lack of signatures have anything to do with abridging First Amendment rights? MR. RUSS. It was a backup attempt to keep the issue off the ballot. Again, we're looking at a November ballot. We're looking at this prospectively. MS. MCDOWELL. But it didn't have that impact. MR. RUSS. But that's essentially like arguing, Your Honor, okay, the defendant says, I robbed the bank, but I gave it back to you before you noticed it. So it's not really a robbery. And that's essentially what the defendant is saying here. Okay, so I hid the signatures and I shouldn't have done it, but here, we made it all right before it could have been on the ballot, so no harm, no foul. I mean, the fact that a government employee, much less a city attorney, is stealing petition signatures or hiding them or however we want to phrase it, and then my client has to file suit to force his hand to turn him in, and then the city officials scramble around and say, okay, well, we fixed everything, no harm, no foul. We've ordered the audit. That's almost an invitation to chicanery on the part of government officials. Well, go ahead and try it. See if you can get away with it. And then if the other guy sues you, well, then you just scramble around and fix it and there's no harm. It seems to me Judge Olin's point is rather different. It's not robbing the bank and giving it back. It's — I don't want to work with your analogy. It's the city council deciding on Basie's — have nothing to do with the signature, that this isn't a proper initiative petition or whatever you call it under the charter, and we're going to get a court to an effect on your First Amendment right, it would not have appeared on the November ballot if the lawsuit was successful. And so it's already being interfered with by the scheduled litigation which was filed before your counterclaim. So I just — I just see a difficulty tying in whatever mischief the city council, the city attorney may or may not have been up to, whatever the explanation for it was. Any tie to that and the fact that for independent reasons, which Judge Olin is asking you about, you know, nobody's giving money back under that analogy. It's that it doesn't fit the charter's requirement, and we're going to have a court say that, and you can deal with the signatures if you want to or not, but you're going to lose your right to be on the ballot if their lawsuit is successful based on subject matter. That's correct, but the two don't necessarily isolate each other out. The fact that you've got two tracks going. From our perspective and the perspective that the trial court adopted is that Mr. Russ and the city council were desperate to keep this off the ballot and were using everything at their disposal. On one track, they filed this lawsuit to try to get an injunction to keep it off the ballot. On the other track, they're tampering with the signatures to make it look like it's not even eligible for the ballot. Maybe they shouldn't have done that. Maybe it's illegal, but in terms of an actual First Amendment violation, I don't see a causal connection in this case between the delay in turning the signatures over to the election people, and it didn't ever affect anything. There wasn't, because the petition was fully aired, it got resolved, it did not keep it out of the, it did not keep it from the city council, it didn't keep it off the ballot, so where's, there was no closure on a violation. Your Honor, that's, I mean. There may have been an attempted violation, but an attempted First Amendment violation is not a violation of First Amendment rights. I mean, I'm just trying to. I understand. To me, that would be like saying, okay, we've had an election contest, and candidate A has been forbidden from speaking at this location in violation of his First Amendment rights, but he won the election anyway, so no harm, no foul. And our position is, the fact that my client ultimately got what he was seeking. No, but the right is to petition to get it on the ballot, isn't it? Correct. And he got that right. He, that was fully vindicated. It was not, Your Honor, I will submit, it never made it to the ballot, because it was mooted by an election. But nothing that, I still can't see how anything that Russ did resulted in a completed First Amendment violation. Your Honor, I would just, I guess my concern is, if the government is free to say. Sue him for, I mean, get criminal charges brought against him. I could go into, this is a crooked little county, and everybody's like that. I wish we could do that. That's why there's the private right of action for civil rights, because unless my client vindicates this, the corruption in that county is not going to stop. That's why we're here. And so now, if the government is free to say, well, hey, let's just hide the signatures, and we'll try this and this and this, and as a last resort, then we'll say there aren't enough signatures. And if we get caught, then we'll just say, oops, and we'll give them back. And it's no harm, no foul. I mean, we're authorizing intentional civil rights violations, authorizing attempts. Well, but, I don't mean to argue with you, but the city council's the only, Russ didn't have the authority to put it on the ballot. And the city council never, it never crossed their minds to keep it off the ballot because of a lack of signatures. I adamantly disagree with that. That's going with their version of the facts. It's not even supported by the evidence, much less by the trial court's finding of the facts. But they never did keep it off the ballot for the lack of signatures. Because it became moot, because there was an election. But they filed a lawsuit, and they never asserted publicly or anywhere else that we're, a reason we're not going to put it on the ballot is the lack of signatures. And they had plenty of time to put it on the ballot before they chose, both sides decided to settle it. So, I don't see how there's any causation between what Russ did, which may have been illegal and wrong, resulted in a First Amendment violation. Because it was up to the city. They were fully sure it was correct, and it, they did. So. That's, that's not the evidence below, Your Honor. I mean. What is the evidence below? How did, how did his failure to give the signatures affect the city council's decision? According to one of the council members in her affidavit, they were not told that this was going on. So. Right. They never, never had an opportunity to side on it because Mr. Russ withheld. That's the whole point. It did not affect their decision of whether to put it on the ballot or not. They made a decision about what to do about this petition, totally independent of any knowledge about adequacy of signatures. Your Honor, I mean, I think it's a sad state of affairs if, if the government is free to pull all this. And my client has to. I agree it's a sad state of affairs. What, if he, if he did this intentionally and knowingly, he should be prosecuted, he should be fired. Lots of bad things should happen to him. But the question is, is it a First Amendment violation when he did not have the authority to put it on the ballot? Somebody had to hire me to vindicate his right to get this on the ballot. And I think we're looking at things retroactively and again saying, oh, well, we fixed it before this became an issue in November. But somebody had to hire me to make sure this was done. Well, they had to hire you in part, I don't know when you were hired, which is none of our business, but there was a declaratory judgment. And if that had been successful, they needed a lawyer to defend that. And they had every right in the world, regardless of the First Amendment violation, to say this is not proper subject matter for an initiative. So I don't, I mean, with fairness to your clients, we certainly seem to have been, you know, there's evidence here that they've been wronged in this case. It still comes down to, is there an injury subject to the First Amendment, founded on the First Amendment, when the litigation that was filed was independent of anything to deal with the litig, with the signatures? I mean, I, well, your time is up. That's good enough. Well, maybe I'm missing something. I just, I'd agree with you what happened here, shouldn't I? I think I would start by addressing some of the issues about the signatures and the City Council. And I recall, as I understand it, says that Mr. Russ never told us that he was withholding signatures, never told us about the number of signatures that got submitted to the County Elections Administrator. And, again, accepting that is true. The lack of signatures would be a reason to keep the initiative off the ballot. So if, even if Mr. Russ failed to inform them that the County Elections Administrator didn't have enough signatures, that doesn't cause the harm of keeping it off the ballot, because that would be a reason to keep it off the ballot, not to place it on the ballot. And the lawsuit itself, I mean, speaks for itself. It was on the grounds that under Texas law, which creates this initiative right, that was not a valid legislative act in that initiative, and, therefore, under Texas law, there was no right to the initiative on that subject. But you're sure of qualified immunity? Yes, Your Honor, but if he's alleging a right to get it on the ballot, if the governing law doesn't give him that right, there's no constitutional right at issue. There's no violation. That's not in front of us. I mean, is it? This isn't a final judgment. We're just looking at qualified immunity. Yes, Your Honor, but, okay, well, we can move on from that. But I think that it is a pertinent inquiry, because Well, that's deciding a merits issue in the lawsuit, whether it would have gotten on the ballot or not. That's way beyond what we're here for. Okay, Your Honor. Let me ask you, what claims does your client need qualified immunity for? What claims are in this case? What? What claims, what constitutional violations, what causes of action do you need, does your client seek qualified immunity on? The claims and the harm alleged by Mr. Johnson is a First Amendment violation and an equal protection violation by keeping, by taking actions to keep this initiative off of the ballot. There has been some briefing on appeal also about retaliation for the exercise of First Amendment rights. Is that claim actually in this case? It was not in the amended complaint, Your Honor. And in the response to the summary judgment, there was no analysis of the elements of retaliation claim. That's not true. I believe it was in the response. But there wasn't a detailed analysis, and that's the first time it came up. So I don't believe it's probably before this Court, because it was never pleaded. Well, you can try things by consent. You don't think it's got far enough to be tried by consent? It first came in in the response to your summary judgment motion, you're saying? Correct, Your Honor. So I believe I briefly addressed it in my reply on behalf of Mr. Russ, and the reply was essentially like that's the first we've heard of this. Well, summarize, what's the case law that's missing on the First Amendment? Are you saying that Myers is all that was really argued in the district court and doesn't cover this? In response to the 12b-6 motion, which was incorporated into the response to the motion of summary judgment, the only authority identified was one that may have been one or the other, but it was Meyer v. Grant and John Doe No. 1 v. Reed. And in the district court's order, the only authority cited is Meyer v. Grant. And for the reasons we discussed previously, assuming it applies to this situation, I don't think it's clearly established that it applies, because the facts are very distinguishable. It was a legislative action, a blanket prohibition on paid circulators, which is nowhere near analogous to the facts of this case. How about the equal protection claim? The equal protection claim is that, as I understand the pleadings and the argument is, that by interfering with Mr. Johnson's First Amendment rights when they didn't do that to anyone else, there's an equal protection violation. So I forget the style of the case that's cited in Mr. Russell's brief, that when the equal protection claim hinges on that First Amendment violation, that your First Amendment rights are violated when others weren't, then the First Amendment analysis controls it. And even the district court's order, I forget the exact language, but the district court's order acknowledges that Mr. Johnson's equal protection claim is derivative of his First Amendment claim. And technically, the way it's pleaded, there's different acts that supposedly violated the concealing the letter from the county elections administrator is the only act alleged that violated equal protection. The interception, the earlier acts, are only alleged to be a First Amendment violation. If there are no other questions, thank you for your time. Roberts. Thank you, counsel. Thank you, sir.